**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**PALM BEACH DIVISION**

CASE NO.  16-80125-CIV-COHN/SELTZER



**ALAN AMRON** Pro se

            Plaintiff,

vs                                                  **AMENDED**
                                                    **COMPLAINT**
                                        **DEMAND FOR TRIAL BY JURY**

**3M MINNESOTA MINING & MANUFACTERING**
**COMPANY AND ARTHUR FRY**

            Defendants.

_____/

**AMENDED COMPLAINT**
**JURISDICTION AND VENUE**

Plaintiff Alan Amron ("Plaintiff" "Amron"), Amended Complaint states as follows:

1.   This is an action brought for the purpose of determining an actual controversy of first to invent inventorship (conception date, put into commerce date, first to invent was in 1973 the USPTO rule 56 (a) (b) under the United States Patent and Trademark office patent rights and copyrights rules, regulations, laws and statues 35 U.S.C. Sections 34, 42 and 102 (a) (b) (c), and for unfair representation of the facts arising under the Trademark Act of 1946, 15 U.S.C. section 1051 et. As amended (hereinafter "the Lanham Act") and the Sherman Antitrust Act 15 U.S.C. Section 1-7 and the Clayton Act 15 U.S.C. section 1121, and Plaintiff is seeking a Declaratory Judgment by this Court of the Plaintiffs' inventorship rights and to preventing the Defendants'

from claiming the utility invention of the sticky note products that they trademarked at first as Press n' peel in 1977 and now the same product as Post-it note since 1980. Venue in this district is proper under 28 U.S.C. Section 1391 and 1400 (b).

      2.  Plaintiffs' livelihood and his personal inventor reputation is being Defamed and thereby damaged directly by the Defendants' on an on going and never ending basis by their daily false claims of the Post it note trademarked sticky note inventions' inventorship. To make Plaintiffs' claim against the Defendants in this case perfectly clear, it is a "**Continuing Tort**" and Plaintiffs' causes of action are "Defamation", "Fraudulent Misrepresentation", "Unclean Hands" and "Negligence" in the continuing daily damage perpetrated by the Defendants' to Plaintiffs' reputation. (see **Exhibit R** attached here to Amended Complaint showing this as a pattern by the Defendants in stealing inventions from tradeshows, and their inequitable conduct at the patent office by not properly reporting inventorship of others, these are specifically and intentionally acts of unfair competition to gain an unfair advantage in the market place) 3M Company must be punished for stealing inventions at trade shows, Defaming the inventors, fraudulently misrepresenting inventorship and unclean hands by way of inequitable conduct at the patent office simply to gain an unfair advantage in the market place.

### CURRENT LEGAL NOTE ON THE DEFENDANTS' INEQUATABLE CONDUCT AS A REGULAR OCCURANCE IN THE PATENT OFFICE

3.  **3M COMPANY WAS FOUND LIABLE FOR INEQUITABLE CONDUCT IN OBTAINING ITS PATENT AND IN STEALING THE INVENTION FROM A TRADE SHOW** (*UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY IN No. 2:10—CV-04413*)

On February 10, 2016, just a few weeks ago, 3M Company lost a patent case in District Court

2

and its subsequent Appeal due to obtaining its patent through **inequitable conduct** and **stealing the invention from a trade show**, and not properly notifying the patent office, then subsequently sought to enforce the patent. The Federal Circuit Court of Appeals affirmed the district court's finding that 3M was liable for antitrust violations in that 3M was found to have obtained its patent through inequitable conduct and subsequently sought to enforce the patent. As a result of 3Ms behavior in both acquiring and enforcing the patent, the appellate court awarded treble attorneys' fees which came to about $26 million. (***Transweb LLC v. 3M Innovative Properties Company & 3M Company* Appeal #2014-1646 – see Exhibit R attached here**)

## THIS IS NOT THE FIRST TIME THE 3M COMPANY HAS VIOLATED PATENT RULES AND STOLE INVENTIONS FROM TRADE SHOWS AND VIOLATED THE PUBLICS TRUST AND CONFIDENCE

I (Plaintiff "Amron") invented something I had called Press-on memo in 1973 and 3M today calls it Post-it note. Inventorship is what I've sued 3M over recently. I sued them over that in 1997 and I'm now suing them again for almost but not exactly the same thing because now it's more about they're continually damaging me and my reputation as an inventor every day they're saying they're the inventor of the Post-it note when, in fact, they publicly claim to have invented it in 1974 and I actually invented and proved it in 1973.

I had just gotten married in 1973 and my wife wasn't home and I had to leave a message for her that I was running out to a meeting. What I did was I took a piece of - we called it memo paper in those days - and I wrote on the memo that I was going to a meeting that I'd be back later. I wanted to post it on the refrigerator. But what happened was I looked around the house for Scotch tape and I couldn't find it. So what I did was I saw some gum on the counter. And while my mind was working while I was looking at the gum and not being able to find the Scotch tape, I took the gum, put a piece in my mouth and started chewing. While I was chewing I was

3

thinking about the tackiness of the gum. And I took a little piece of the gum out of my mouth and I kneaded it. I mushed it around. I got a little dust off the counter. I put it in the little piece of gum and I mushed it around and squashed it right on the refrigerator. Then I put the note on it and I pulled it a little bit to see if it held and it held and I left. When I got home my wife was very impressed with the fact that I left her a note and the fact that the note was still on the refrigerator and then came right off without it leaving a residue mess when she took the note off. She suggested and I agreed that it was a great product and I started to develop the adhesive for it. The adhesive had to be tacky enough to stick. repositionable enough to position it on a surface or a paper or a refrigerator. We didn't have magnets in those days and I couldn't use duct tape because it would have left a residue on the refrigerator. So I was working on an adhesive that would be tacky enough to be put on the back of a memo pad or piece of paper, that you could put it onto another piece of paper or to a refrigerator or a window or a door or something like that and reposition it.

I invented a battery operated water gun in the same 1973. And I had two products that I took to an invention show. I had the Press-on-Memo and I had the battery operated water gun. So I went to this invention show and had a 10-by-10 booth at the Sheraton Hotel in New York City. As an inventor I was young and I wanted to get my products across to people, offer it for sale, put it into commerce as they call it and a local news channel came around and covered my battery operated water gun but not my Press-on-Memo. They didn't think that product was worthy of television. So after they covered my battery operated water gun, the attention at my booth drew over two men in suits from 3M with colorful business cards the 3M was in color, they gave me their business cards and said "can we have samples of your Press-on-Memo and a sample of your spray adhesive that you used for the Press-on-Memo. We would like to consider it at 3M.

4

I was very excited. I thought that was it as an inventor at a very young age, it would have made my life. So I gave them the samples. I had their cards and I was going to call them, or they were going to call me in the next couple of weeks, and I never got a call from them.

The first couple weeks after I met them I called them and said I didn't hear from you and they said "we checked it out and all our different departments at 3M and found out that you can't really print glue". "You can print ink and you can clean the machines but you can't print glue because it will gum up the machines and also it's too expensive". "So we pass". So I got off the phone and 'OK, they pass' I'll keep making it myself and try to make a product out of it. Then a few years later my son and I were watching television and we saw the space shuttle. The Gemini space shuttle was in space and the space guy was floating around and he had a note that he put on his console and my son turned to me and he looked at me and said, ''That's your invention, how could they do that?'' And I said, "I don't know'' but I was happy to see it in space.

My son asked me how they could do that, it's your invention, how could they do that. So I notified 3M by letter that they, I found out 3M was making it and I notified them by letter that they can't be claiming they invented it because I had rights to first inventorship and they didn't respond to me. So having had some experience from my battery operated water gun with litigation and patent litigation, I knew enough how to file a pro se case against 3M and I did and they responded like a week after I filed the complaint. I did a complete complaint with A to Z kind of exhibits proving my point, not having this Perry Mason moment, not having this smoking gun kind of thing waiting for Court. I put it all in the complaint so they could legitimately see I was first to invent. And when they called me they were willing to settle right away. And then they started sending me - in those days we just had a fax - so they started faxing me different patents to look at to see. They said we didn't invent the sticky note pad and you didn't invent the

5

sticky note pad. It was already invented in Switzerland by another guy in 1968. And when I saw

that I said, "Ok, if they didn't invent it in '74 and I didn't invent it in '73 then the guy in '68 must

have invented it and it was prior Art so I said I'm willing to settle the case, now that I know that

they didn't invent it and I didn't invent it because then I knew that my case would have been

futile, so I asked them to just pay for my legal fees. So they said we'll give you the money for

the legal fees, and we settled the case and it was done.

Well in 2011 I started hearing rumors that Art Fry, who worked for 3M, and Spencer, who

worked for 3M, got together and in 1974 invented the combination sticky note and notepad.

Hearing that in the press and in the news, I'm saying they told me they didn't invent that, they

told me I didn't invent it, why are they now coming out saying they invented it? So I felt they

were breaching the 1998 settlement agreement that we had or the understanding that led to the

settlement agreement. So I called 3M again, I notified them in 2011 and said "you told me at the

time you didn't invent it, I didn't invent it. We settled the case, why are you now again claiming

you invented it?" And they said we don't know and then again they sent me the same Swiss

patent in 2011 thinking that would make me go away again and it didn't. It just made me very

mad to actually see they were trying to again make me think that we didn't invent it. But yet they

were still claiming they did.

It's a guy by the name of Walter in Switzerland. It's 1968. It's expired by now but the patent

doesn't really call for the combination of the sticky note and a note. The patent calls for an

adhesive with a note. And that way if you put it on a piece of paper and pull it off it'll leave a

residue. If you put it on a refrigerator and pull it off, it'll leave a residue. So it wasn't the same

successful tacky note that 3M and I claimed to have invented.

I never filed a patent on it. I invented two things in 1973, my first two inventions: one was the

6

battery operated water gun and one was the Press-on-Memo, which is now known as the Post-It-Note.

And what I did was I didn't know enough about patents and when I went to a patent lawyer he wanted a lot of money and I was young, I didn't have the money. So I didn't file patents right away. With the Press-on-Memo a year had gone by. With my water gun I still had a little time so that one I still filed a patent on and made millions of dollars years later on. But in inventorship, you never lose the inventorship. Prior art, or being first to conceive an idea, whether you file a patent or not, gives you the inventorship right.

I think if 3M licensed it from me we wouldn't be in this position. We'd all be rich and famous over it but I think because they didn't license it from me. If I did have a patent they probably would have gone with the Spencer patent in 1970, which was for the sticky glue, and in 1974, inventing the combination and they would have claimed that their combination of sticky and mine are different. So they would have claimed that they invented different than what I had anyway. I believe. I don't know. Hypothetical.

I want inventorship. I want 3M to say that I am the inventor in 1973. They've already come out and said Spencer and Art Fry invented it "in church in 1974". It's on public record all over the world that in 1974 he invented it in church. And it's all over the world that I put it into commerce in 1973. I just want them to admit that I am the inventor and that they will stop saying that they are the inventor.

In litigation you have to have a remedy and the remedy in Court is usually financial. So I put money in here, but if the Defendants' were willing to give me inventorship with a little money, I'd be happy with that. We put in $400 million in our Amended Complaint because it's a reasonable amount of money out of the $40 billion the Defendants really should be giving me.

Over the past 40 years the revenue over the Post-It-Note line is much more than $40 billion and according to patent rule 56a, that if I prove inventorship, that if they made revenue over the last 40 years by ill-gotten gains I should be getting all that revenue over the past 40 years.

Like everybody else, when I go to write a memo or leave a note for somebody or to mark something, I used Post-It-Notes. It's convenient. it's all over the world. It's iconic. I don't think there's anybody in the whole world you can ask about Post-It-Notes and they wouldn't know about it. They'd all have it or used it or know about it.

3M kept saying I had nothing to do with the success of the Post-It Note. The Post-It Note is a trademark. The utility invention is a sticky note, no matter what you call it. The first thing they called it in 1977 when they first released the Post-It-Note, they called it Press-N-Peel. And it wasn't until 1980 that they called it Post-It-Note. So they kept claiming I had nothing to do with the success of the Post-It-Note. And they're right, the Post-It-Note trademark I had nothing to do with. Mine was called Press-on-Memo. But you know the name of the product is not the invention. The invention is the utility of the product. To be able to put a sticky note on a surface, to reposition it and not leave a residue is the invention.

You're allowed to do it, you're allowed to manufacture it and sell it. The only difference is that if your chemical structure is the same as Spencer's that 3M owns, well then you can't. Today you can. Years ago you couldn't because the patent was still in force. But that patent has expired since then, so if you wanted to go out today and even use Spencer's chemical mixture for a sticky adhesive on a note paper, you could use it without being sued by 3M. Anybody can.

I did in 1998. I went to Dennison. And Dennison was interested in licensing my Press-on-Memo. And what the problem was their lawyers wanted to see my agreement that I had with 3M because they didn't want to get sued by 3M. They wanted 3M not to get involved. And so I said they're

not going to get involved. I have an agreement that says I can make my combination, as long as it wasn't Spencer's at the time, of the sticky glue on a note and call it Press-on or call it anything I want and they'll leave me alone. But they would not let me show that agreement to Dennison and because of that Dennison pulled out from a $50,000 advance and a one and a half percent royalty that I could have been a millionaire or billionaire from today.

I'm writing a book and the end of the book is this is pretty much the end of my life, I'm 67 years old and I wrote a book on all the people I managed like Muhammad Ali, Kristy McNichol, Robert Guillaume, and partners that I was with, Pat Summerall, Tina Sinatra and things like that. I have other inventions like the battery operated water gun, the photo wallet for Nikon camera, First Down Laser line for football. All of these other inventions I did is my book. The story has to have an ending and if I can't prove I'm the Post-It-Note inventor, legitimately, not just because I say it, the publishers and movie studios are saying what's the ending. We can make up an ending but we want it to be a true story.

I don't own the sticky note invention. You see that's something people don't understand. I don't own the sticky note. Nobody owns the sticky note. The sticky note belongs to the world. It's called prior art and it's in the public domain. What I own is the inventorship rights. I am the inventor of the Press-on-Memo, which is today known as the Post-It-Note by 3M.

That's part of the book and the people I've been telling for the past few years that I'm the inventor of it will then realize that I really am because you tell people you invented it and they go ''yeah, yeah, yeah sure you did, I thought Art Fry.'' I mean it's a myth. I say it's a myth but most people say Art Fry invented it in church. And the truth of the matter is he did invent it in church in 1974 but I invented it in 1973, put it into commerce already in 1974, which makes me the inventor.

The facts are the facts. In 1974, Art Fry claimed to invent the Post-It-Note. It's all over the world. It's publicized. In 1973, it's all over the world and publicized that I invented my Press-on sticky note in '73, which is a year prior to that. So just admit to the fact that I am the inventor of not the Post-It-Note trademark but the Post-It-Note utility invention products. All the products made under the Post-It-Notes name, as far as the little tabs that they sell and the big posters they sell, all of the sticky note, whether it's large, small, yellow, white, pink, whatever is the same product, the same utility invention that I put into commerce in 1974.

I don't show it publicly because nobody cares to see how you hurt over things usually but privately it's affected me immensely because all my partners over the years, they already know me and I've made a lot of inventions. I've got 40 United States patents in the Patent Office. I have a lot of successful patents. Ninety-nine percent of the patents in the world don't make any money at all. I'm in the one percent. I made a lot of money from my patents. But they always seem to see that little sore in the corner. And the sore is did I really invent the Post-It-Note? Yeah, I see it in paper. I see the proof that you did it in 1973. I see the proof that they did it in 1974. But the bottom line is why isn't 3M admitting to it? Something's wrong there. And 3M's a powerful company.

The emotional effect that this had on me is that I go to sleep every night thinking about the 3M case. I wake up in the morning every day thinking about the 3M case. And it has an emotional toll on me. Physically, mentally and financially. Financially I do the pro se work myself because I know patent work really well but I do have legal advisers that I have to pay a fee to tell me whatever I'm filing is crazy or it works. If it doesn't work, they suggest how to make the changes and I make the changes. if it works, they say ok that's great, let's do it. So the financial and emotional stress of this has been immense. And at 67 years old, emotional stress of any sort is

pretty heavy stuff.

The invention is not the name or trademark (Press n' peel in 1977 and Post-it not7e in 1980) of a product, its the utility and use (**Sticky** repositionable reusable combination and **Note**) of the product that is the invention.

First to put it into use and offered for sale in commerce (Amron in 1973 then 3M Fry in 1974) is the inventor. Amron therefore is the inventor in 1973 of the sticky note utility product that was trademarked and called by 3M (Press n' peel in 1977 and the same sticky note product they called it Post-it note in 1980) and known throughout the world today by the name Post-it note.

## BACKGROUND

4.   Inventor and inventorship in the United States in 1973 was defined to comprise of two steps: (1) conception of the invention (Amron conceived it in 1973 and made it public - 3M conceived it in 1974 and concealed it) and (2) reduction to practice of the invention (Amron reduced it to practice in 1974 and put it into commerce under the product name *Press-on Memo* - 3M reduced it to practice in 1977 and put into commerce under the product name *Press n' Peel*). When an inventor conceives of an invention and *diligently* reduces the invention to practice (by practicing the invention), the inventor's date of invention will be the date of conception. Thus, provided an inventor is diligent in actually reducing the invention to practice and not *CONSEALING IT*, he or she will be the first inventor and the inventor entitled to inventorship, a patent, even if another files a patent application, constructively reducing the invention to practice, before the inventor.  The issue in this litigation is "Inventorship". In 1973 the "First to invent" (Inventorship) was the rule 56 (a) (b) of patent law. (See as **Exhibit C-I** attached here, including but not limited to the U.S. Federal case CV-97-7281 Amron vs 3M in the Eastern

11

District of New York, and its 29 Exhibits) The Exhibits 1-29 in the Amron vs 3M case clearly show Amron's original Conception inventorship date of 1973, and Plaintiffs putting it into practice in 1974, and put it in use in commerce offering it for sale in 1974. Defendants "3M' and "Fry" have publically admitted to invention conception date "by accident in Church in 1974", clearly one year after Amrons' 1973 shown date. **(See attached Exhibits A and D)**

The facts in this (David) Plaintiff "Amron" vs (Goliath) Defendants "3M" and "Fry" case are simple;

Plaintiff "Amron" invented the combination sticky notes paper and pads as Press-On Memo in **1973.  (See attached Exhibits D-I)**

Plaintiff "Amron" introduced his invention in commerce the combination sticky note paper and pads as Press-On Memo in **1974. (See attached Exhibits D-P)**

Defendant Arthur "Fry" invented a combination sticky and note paper and pads in **1974** and CONCEALED IT until 1977 as Press n' Peel. **(See attached Exhibit A)**

Defendant "3M" introduced in commerce a combination sticky note paper and pads as Press n' Peel publicly in **1977,** then again as Post-it note in **1980. (See attached Exhibit A)**

Defendants "Fry" and "3M' reintroduced **the sticky note** in commerce a combination sticky note paper and pads as Post-it note publicly in **1980. (See attached Exhibit A)**

**It seems a matter of "Res judicata" since all the facts here are publically known and clear:** "Amron" invented the combination sticky notes and pads in 1973, and didn't conceal it but made it public.  Arthur "Fry" and "3M" claimed to have invented the combination sticky notes and pads in 1974, but in fact they "concealed it" from the public until 1977 when they finally released it by the name Press n' Peel. Amron is the clear inventor and should have proper inventorship here.  It's simple;

1- Press-on memo - in 1973 by Plaintiff **Amron**

2- Press n' peel - in 1977 by Defendants **3M Fry**

3- Post-it note - in1980 by Defendants **3M Fry**

*"A rose by any other name would smell as sweet"*
*William Shakespeare*

"**A rose by any other name would smell as sweet**" is a frequently referenced part of William Shakespeare's play *Romeo and Juliet*, in which Juliet seems to argue that it does not matter that Romeo is from her rival's house of Montague, that is, that he is named "Montague."

**The reference is often used to imply that the names of things do not affect what they really are.**

**The name of a product (Press-on memo** or **Press n' peel** or **Post-it note) is not the invention, the invention is it's utility use of the product (Sticky** repositionable reusable combination **note).**

## THE PARTIES

5.      Plaintiff Alan Amron is a citizen of Palm Beach County, State of Florida.

6.      Plaintiff "Amron" is a professional inventor making his living all of his life as a known American inventor, with 39 United States Patents awarded and issued to him in several different product industries. His name and reputation as an American inventor has been severally damaged and continues to be damaged daily directly due to the Defendants' actions.

7.      Upon information and belief, Defendant 3M Minnesota Mining and Manufacturing Company (corrected name - 3M Company) a Consumer products maker and distributer ("Defendant" or "3M") is a "**3M Company**" formed and existing under the laws of the State of Minnesota. (The basis of Plaintiffs' information and belief is the listed corporate

address by Defendant in 3M vs IRS case and Defendants Counsel in this case has noted on the record)

8.    Upon information and belief, Defendant Arthur Fry is/was an employee of Defendant "3M", a Consumer products maker and distributer ("Defendant" or "FRY") is/was an employee of a company formed and existing under the laws of the State of Minnesota.  (The basis of Plaintiffs' information and belief is the listed corporate address by Defendant in 3M vs IRS case.)

9.    Upon information and belief, for purposes of diversity of citizenship jurisdiction in the Federal Courts, Defendants are a citizens of states other than Florida since, upon information and belief, none of its partners is a citizen of the State of Florida. (Again, the basis of Plaintiffs' information and belief is the Defendants own websites and other litigations.)

10.   This Court has jurisdiction over this matter based upon diversity of citizenship under 28 USC § 1332(a) because the amount in controversy exceeds $75,000.

11.   Venue is proper in this Court because the Plaintiff resides in the district in which this Court sits.

12.   Post-it Notes trademarked is an over-the-counter iconic world known stationery item, its utility is the sticky note products in its line.

13.   Upon information and belief, at all relevant times, the Defendants were the manufacturer of trademarked Press n' peel in 1977 and Post-it notes in 1980 sticky notes products lines.

14.   Upon information and belief, at all relevant times, the Defendants were distributors of trademarked Press n' peel in 1977 and Post-it notes in 1980 sticky notes products lines.

14

15.     Upon information and belief, at all relevant times, the Defendants were a seller of Press n' peel in 1977 and Post-it notes in 1980 sticky notes products lines.

16.     Upon information and belief, at all relevant times, the Post-it notes marked sticky notes products lines were marketed by Defendants as an appropriate over-the-counter stationery sticky repositionable, reusable memo paper pad products.

17.     Based upon such marketing, the Defendants expressly represented to consumers, including Plaintiff, that Post-it notes is an invention innovation by "3M" and Arthur "Fry" in 1974. (The basis for the Plaintiff's information is from company websites and Wikipedia pages posted on the internet and Google search as example attached here as **Exhibits A & P**)

18.     In reliance upon Defendant's representations regarding the claims of inventorship of Press n' peel in 1977 and Post-it notes in 1980 the sticky repositionable reusable paper notes pads product, Plaintiff Alan "Amrons'" reputation as an American inventor of the first such sticky notes repositionable reusable memo note paper combination product in 1973, has caused Amron irreparable emotional and financial damage which continues daily thru today as long as the Defendants are allowed to continue to falsely claim its' inventorship.

19.     In reliance upon Defendant's representations and claims regarding the inventorship dates of the Press n' peel in 1977 then Post-it note in 1980 sticky products, the answer to not using pins magnets and or scotch tape to post a memo or a note on to a surface without damaging the surface, and being able to reposition it over and over again, Plaintiff Alan Amrons' reputation as an inventor has been and continues to be on a daily basis irreparably defamed and damaged.

20.     Unknown to the Plaintiff, and upon information and belief the Post-it note that has become the most iconic stationery invention combination sticky note product on the planet,

15

Defendants Art "Fry" and "3M" continue to falsely claim its' inventorship when in fact they publically claim to have invented it in 1974 and when clearly Plaintiff "Amron" invented and put it into commerce in 1973, a year prior.

21.     Plaintiff Alan "Amron" sustained extreme personal emotional and financial, including pain and suffering, as a direct result of Defendants "3M" and Arthur "Fry"s continual to this day, false and misleading inventorship claims in public, thereby defaming him and damaging his inventing reputation.

22.     Specifically, Plaintiff Alan "Amron" repeatedly and frequently suffered severe emotional (loss of creditability - defamation) and financial distress directly relating to the Defendants repeated continual to this day false and misleading verbal and in print claims of first inventorship. (see **Exhibit P** attached here)

23.     Upon information and belief, such severe emotional pain was/is caused by Defendants continual false and misleading claims of first inventorship.  The basis of such information and belief is that the frequency of the emotional and financial pain substantially diminished when Mr. Amron was credited with inventorship, substantially increased when Mr. Amron again began hearing and reading about Defendants' false claims of inventorship.

24.     In addition, upon information and belief, the damage done to Plaintiff "Amron" by the Defendants "3M' and "Fry" continual right up to today false and misleading claims of first inventorship is permanent.  The basis of such information and belief is that "Amron" continues to suffer occasional but severe emotional pain and financial hardships the likes of which he never suffered before he initially began hearing the Defendants "3M' and "Fry" continual false and misleading (defaming to the Plaintiff reputation as a known inventor) first inventorship claims.

16

25.    Moreover, upon information and belief, government authorities have documented the fact that Post-it notes produced by "3M" and Arthur "Fry" in 1977 was, based on company press and spokespersons inventorship releases that it was invented first by Arthur "Fry" in 1974 publically concealed it until 1977. Plaintiff who actually invented it and put it into commerce in 1973 was and continues to be in fact severely defamed and thereby damaged by this. **(see Exhibits B-R attached)**

## AS AND FOR A FIRST CAUSE OF ACTION
### (Continuing Tort - Negligence)

26.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 25 above, with the same force and effect as if set forth in full herein.

27.    Defendants "3M' and "Fry" had a duty to exercise reasonable care and diligence in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Post-it notes into the stream of commerce, including a duty to assure that the inventorship claims to the products would not cause others to suffer unreasonable personal and public defamation reputation damages.

28.    Defendants' failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Post-it notes into interstate commerce in that Defendants' knew or should have known that Post-it notes product sticky notes repositionable reusable paper memo notes combination pads was created and invented by the Plaintiff in 1973, (see **Exhibit C** attached and citing U.S. Federal case CV-97-7281 AMRON vs 3M in the Eastern District of New York) including but not limited to severe emotional pain and dire financial effects which

17

injuries are continual permanent and lasting in nature and mental anguish, including diminished enjoyment of life.

29.     The negligence of Defendants, its agents, servants and/or employees, included but was not limited to manufacturing, promotion and producing Post-it notes in such a manner as to permit the inventorship of the product to become a continual to this day issue of contention to Plaintiff and others publically worldwide.

30.     Despite the fact that Defendants' knew or should have known that Post-it notes products sticky notes combination had been invented by Plaintiff "Amron" in 1973, had caused fraudulent misrepresentation allegations on the part of the Defendants in not reporting this Amron prior art to the United States Patent office, (see **Exhibit R** attached here showing this as a pattern of unclean hands at 3M a recent February 10, 2016 case **Transweb LLC v. 3M Innovative Properties Company & 3M Company- where 3M Company was again held to be liable for this very same inequitable conduct in obtaining a patent "as in this case" by getting samples of the invention at a tradeshow one year before filing for a patent on it and not properly as required disclosing it to the patent office**) Defendants continued to market, manufacture, distribute and/or sell Press n' peel and Post-it notes to consumers, falsely continuing even today to stating that they invented it first by "mistake in 1974 in Church", thereby defaming and damaging the Plaintiffs' good name and his inventing life reputation, who clearly invented it and put it into practice and use in commerce in 1973/74. (See **Exhibits B-R** attached and citing U.S. Federal case CV-97-7281 Amron vs 3M in the Eastern District of New York in **Exhibit C**)

31.    (Goliath) Defendants' "3M" and "Fry" knew or should have known that (David) Plaintiff "Amron" would foreseeably suffer injury to his reputation as a result of Defendant's continued failure to exercise ordinary care and diligence, as set forth above.

32.    Defendant's negligence was the sole proximate cause of Plaintiffs' injuries which he has suffered and will continue to suffer unless inventorship is corrected in the worlds public view, and the Defendants' are legally prevented from claiming inventorship ever again.

33.    As a result of the foregoing fraudulent acts and omissions, Plaintiff "Amron" was and is still caused to suffer extreme emotional and financial damages and embarrassment from the continued to this day false and misleading fraudulent first inventorship claims of the Press n' peel in 1977 and then Post-it notes in 1980 combination sticky note products lines promoted by the Defendants "3M' and "Fry", as described above.

34.    Defendant's "3M' and Fry" actions were willful, wanton and/or reckless.

35.    By reason of the foregoing, Plaintiff Alan "Amron" has been defamed damaged and continues to be defamed and damaged and is entitled to recover as against Defendants "3M" (corrected named Defendant - 3M Company) and "Fry" jointly and severally in an amount to be proven at trial, but not less than $200 million dollars.

36.    By reason of the foregoing, Plaintiff "Amron" is also entitled to an award of punitive damages against Defendants "3M" and "Fry" in an amount to be determined at trial, but not less than $200 million dollars.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Continuing Tort – Defamation)

37.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 36 above, with the same force and effect as if set forth in full herein.

38.     At all times herein mentioned, Defendants designed, research, manufactured, tested, advertised, promoted, marketed, sold and distributed Post-it Note is hereinabove described that sticky combination of repositionable reusable paper notes product which was invented by Plaintiff "Amron" in 1973. (see **Exhibits C-R** attached citing U.S. Federal case CV-97-7281 Amron vs 3M in the Eastern District of New York)

39.     The Press n' Peel in 1977 then later Post-it Note in 1980 was expected to and did reach the usual consumers, handlers, and persons coming into contact with that combination note paper pad and sticky tacky removable adhesive cement product without substantial change in the condition in which it was produced, manufactured, sold, distributed and marketed by Defendants.

40.     At those times, Press n' Peel in 1977 and Post-it Notes in 1980 combination note paper pad and sticky tacky removable reusable adhesive cement product was in fact invented and put into use by the Plaintiff "Amron" in 1973, when false and misleading claims of first inventorship by the Defendants was clearly stated to be in 1974 and then concealed from the public until released as Press n' Peel in 1977, and in particular, it caused and continues to cause to this day emotional and financial damage to the Plaintiff "Amron" herein.

41.     The Press n' Peel in 1977 then Post-it Note in 1980 sticky combination of repositionable reusable paper notes combination note paper pad and sticky tacky removable reusable adhesive cement product utility design, research, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was defective in its continuing to carry the invented first by "3M" and Art "Fry" false and misleading claims even today associated with the products, particularly, but not limited to, the fact that the product was invented in 1973, a year before 3M claimed they invented it, by the Plaintiff Amron, as described above.

20

42.     The Press n' Peel in 1977 and then Post-it Note in 1980 combination paper and sticky adhesive  product utility design, research, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was defective in that, when it left the hands of Defendants to announce first to invent inventorship in 1974 of the products, while knowing full well or should have known full well, the Plaintiff had in fact already invented it in 1973 one year prior to 3M claim of 1974, as described above.

43.     The 1977 Press n' Peel then named in 1980 Post-it Notes utility product designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant also was defective due to inadequate and continued false misleading claims of its first inventorship publically in the media and to its customers including the Plaintiff "Amron".

44.     Specifically, Defendant knew or should have known of the risks associated with the continued false and misleading claims of first inventorship, including the risk of the type of injuries suffered by the Plaintiff, but failed to provide adequate information to public, users or consumers of the products, and continued to improperly advertise, market and/or promote Post-it Notes combination sticky contactless adhesive and note paper products as its maker and inventor while generating literally billions of dollars in revenue for the Defendants each and every year.

45.     By reason of the foregoing, Defendants have become liable, by having slandered and defamed the Plaintiff "Amron" in the continued to this day representation, manufacturing, marketing, promoting, distribution, and selling of a falsely claimed first inventorship of the iconic utility sticky tacky combination of repositionable reusable paper notes products the world knows and is trademarked as Post-it Notes.

46.     Defendant's actions were continuous, willful, wanton and/or reckless.

21

## (a) DEFAMATION AND DAMAGE TO INVENTORS REPUTATION CAUSE OF ACTION

In an action against his former employer, Seagate, Mr. Shukh filed an action in federal district court charging that **his reputation was harmed** by Seagate's failure to include him as an inventor on 6 Seagate patents. The district court dismissed the action finding that Mr. Shukh did not provide sufficient evidence to support his case. However, the Federal Circuit Court of Appeals that hears patent cases, vacated the lower court's decision. The court found that "being considered an inventor of important subject matter is a mark of success in one's field comparable to being an author of an important scientific paper."

> If you are an inventor, and you are not identified as such you have a case based on harm to your reputation. As the court stated, if you are correctly an inventor of important subject matter, being recognized as such is a mark of professional success. Failure to be properly included as an inventor may harm one's reputation which is actionable.

*Alexander Shukh v. Seagate* (Fed. Cir. 2015)
Mr. Shukh sued his former employer Seagate asking for a correction of inventorship under 35 U.S.C. § 256 as well as breach of contract and discrimination associated with his firing. Because Shukh had already assigned-away his ownership rights to the patents, the District Court ruled that the Shukh's standing for the inventorship claim hung on his alleged reputational harm due Seagate's failure to list him as a co-inventor on six different patents. The district court also dismissed the state law allegations for failure to state a claim. At the close of discovery, the district court then dismissed the case on summary judgment – finding that Shukh had not produced evidence to prove the reputational harm.

On appeal, the Federal Circuit has vacated the lower court's summary judgment –
*Today, we hold that concrete and particularized reputational injury can give rise to Article III standing. As we noted in* Chou, *"being considered an inventor of important subject matter is a mark of success in one's field, comparable to being an author of an important scientific paper." 254 F.3d at 1359. We reasoned that "[p]ecuniary consequences may well flow from being designated as an inventor." Id. This is particularly true when the claimed inventor is employed or seeks to be employed in the field of his or her claimed invention. For example, if the claimed inventor can show that being named as an inventor on a patent would affect his employment, the alleged reputational injury likely has an economic component sufficient to demonstrate Article III standing.*

*We find that there is a question of material fact as to whether Dr. Shukh's omission as a named inventor on the disputed patents caused him reputational injury. Dr. Shukh presented evidence such that a trier of fact could conclude that this omission injured his reputation in at least two ways: first, it harmed his reputation as an inventor in the field of semiconductor physics, and second, it contributed to his reputation for poor teamwork due in part to his accusations that others were stealing his work. Moreover, Dr. Shukh presented evidence from which a trier of fact could conclude that these reputational harms had economic consequences—namely, that Dr.*

22

*Shukh was unable to find employment after he was terminated from Seagate.*

**Hereby Assign**: Shukh's employment contract with Seagate included a statement that he "hereby assign[s]" his future invention rights to Seagate. Although these contracts are generally interpreted by state-law, the Federal Circuit issued a 1991 patent-specific ruling that this clause results in an automatic assignment of rights. *Filmtec Corp. v. Allied-Signal*, Inc., 939 F.2d 1568 (Fed. Cir. 1991). The *Filmtec* outcome should be contrasted with agreements where employees "agree to assign." In the agreement-to-assign case, legal title does not shift until the inventor actually does assign after inventing. In his appeal, Shukh asked the Federal Circuit to overrule Filmtec – which it refused to do here on *stare decisis* grounds. "[W]e cannot overrule that holding without *en banc* action."

The suggestion for *en banc* action has some strong backers. In his dissenting opinion in *Stanford v. Roche*, Justice Breyer challenged the Federal Circuit rule. Relying upon history and tradition, Justice Breyer wrote that the initial "hereby-assign" employment contract as creating equitable title in the invention whose legal title does not automatically transfer.

*Given what seem only slight linguistic differences in the contractual language, this reasoning seems to make too much of too little. Dr. Holodniy executed his agreement with Stanford in 1988. At that time, patent law appears to have long specified that a present assignment of future inventions (as in both contracts here) conveyed equitable, but not legal, title. See, e.g., G. Curtis,* A Treatise on the Law of Patents for Useful Inventions *§170, p. 155 (3d ed. 1867) ("A contract to convey a future invention . . . cannot alone authorize a patent to be taken by the party in whose favor such a contract was intended to operate"); Comment,* Contract Rights as Commercial Security: Present and Future Intangibles, *67 Yale L. J. 847, 854, n. 27 (1958) ("The rule generally applicable grants equitable enforcement to an assignment of an expectancy but demands a further act, either reduction to possession or further assignment of the right when it comes into existence").*

*Under this rule, both the initial Stanford and later Cetus agreements could have given rise only to equitable interests in Dr. Holodniy's invention. And as between these two claims in equity, the facts that Stanford's contract came first and that Stanford subsequently obtained a postinvention assignment as well should have meant that Stanford, not Cetus, would receive the rights its contract conveyed.*

> *In 1991, however, the Federal Circuit, in FilmTec, adopted the new rule quoted above—a rule that distinguishes between these equitable claims and, in effect, says that Cetus must win. The Federal Circuit provided no explanation for what seems a significant change in the law. Nor did it give any explanation for that change in its opinion in this case. The Federal Circuit's FilmTec rule undercuts the objectives of the Bayh-Dole Act. While the cognoscenti may be able to meet the FilmTec rule in future contracts simply by copying the precise words blessed by the Federal Circuit, the rule nonetheless remains a technical drafting trap for the unwary. It is unclear to me why, where the Bayh-Dole Act is at issue, we should prefer the Federal Circuit's FilmTec rule to the rule, of apparently much*

> *longer vintage, that would treat both agreements in this case as creating merely*
> *equitable rights*

## (b) CONTINUOUS TORT CLAIM

Herbert and Karen Wreden served a tort claims act notice against the Township of Lafayette on January 28, 2008, due to the Township's construction of a retaining wall and water drainage adjacent to the Wredens' property. As a result of this construction, water was directed onto their property and caused flooding. In 2009, the retaining wall collapsed, sending large blocks of concrete tumbling onto their property and causing an unstable and unsafe roadway frontage in front of their property. On June 28, 2011, in <u>Wreden v. Township of Lafayette</u>, 2014 N.J. Super. LEXIS (App.Div. 2014), plaintiffs filed suit against the Township, alleging damage to their property.

On the trial court level, Lafayette successfully obtained a dismissal of the complaint based upon a failure to state a cause of action. This type of motion differs from a summary judgment motion because its basis is that the complaint itself fails to state a claim, as pled, as opposed to the court considering other evidence submitted such as certifications or testimony.
The Township claimed that:

> the plaintiffs' claims for a continuing tort were barred by the two-year statute of limitations;
> that the plaintiffs were required to submit a new notice of tort claim to seek damages for the collapse of the retaining wall on their property;
> that it was entitled to plan or design immunity; and
> that the plaintiffs' inverse condemnation claim was barred by the entire controversy doctrine.

The trial court granted a dismissal on all of the first 3 bases and refused to permit an amendment to the complaint on the 4th basis. However, the Appellate Division reversed all of the trial court's rulings and remanded the matter back to the trial court.

First, the appeals court found that the trial court failed to consider that the plaintiffs faced continuous flooding to their property and improperly focused only on the date the notice of claim was filed. Although the suit was not filed until three years after the notice of claim, the trial judge made no determination as to the applicability of the continuing tort doctrine. Contrary to the judge's ruling, the Appellate Division noted that the date upon which a notice of claim is filed does not mark the accrual date for a cause of action in a continuing tort case.

Second, the Appellate Division disagreed with the trial court that the plaintiffs would have to file a new notice of tort claim when the retaining wall collapsed. The plaintiffs had already placed the Township on notice of the problem and the eventual collapse of the wall was merely a continuation of the tort plaintiffs had previously described.
Third, the appeals court found that the trial court judge mistakenly considered evidence external to the pleadings (a certification from a Township Committee member) as to the Township's

approval of the project in granting a dismissal based upon the plan and design immunity defense. While such evidence may be considered in a summary judgment motion, it cannot be considered in ruling on a motion to dismiss based upon the pleadings.

Last, on appeal, the Court found that the trial court judge erred in refusing to permit the plaintiffs to include an inverse condemnation claim against the Township in an amended complaint. This case was still ongoing as to the other defendants when the plaintiffs learned that some of the retaining wall was actually built on their property. No final judgment had been entered as to all parties and, hence, the plaintiffs should have been permitted to amend their complaint to assert this new claim.

> This case is a published decision and is precedential. Thus, public companies need to take note of this case for any claims that arguably involve a continuous tort and be aware that, if the damage is continuing to occur, the statute of limitations to file suit against that public company has likely not started to run.

47.    By reason of the foregoing, Plaintiff Alan "Amron" has been damaged and continues to be damaged daily and on an on going basis, and is entitled to recover as against Defendants jointly and severally in an amount to be proven at trial, but not less than $200 million dollars.

48.    By reason of the foregoing, Plaintiff "Amron" is entitled to an award of punitive damages against the Defendants jointly and severally in an amount to be determined at trial, but not less than $200 million dollars.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Continuing Tort - Unclean Hands)

49.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 48 above, with the same force and effect as if set forth in full herein.

50.    Defendants expressly and continually even today warrant that Press n' Peel in 1977 and then Post-it Notes in 1980 utility products was and is today invented by "3M" and Arthur "Fry", as described above.

51.   Defendants impliedly warranted and continue today in 2016 to warrant that Press n' Peel in 1977 and then Post-it Notes from 1980 to 2016 was invented by "3M" and Arthur "Fry", even today as described above.

52.   Defendants breached its express warranty as described above.

53.   Defendants breached its implied warranty as described above.

54.   By reason of the foregoing, Plaintiff Alan "Amron" has been damaged and continues to be damaged daily, and is entitled to recover as against Defendants "3M' and "Fry" jointly and severally in an amount to be proven at trial, but not less than $200 million dollars.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Continuing Tort - Fraudulent Misrepresentation)**

55.   Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 54 above, with the same force and effect as if set forth in full herein.

56.   Defendants continue to this day in 2016 to falsely and fraudulently represent to the public, including Plaintiff, and the United States Patent and Trademark office that Press n' Peel in 1977 and then Post-it Notes in 1980 utility sticky combination of repositionable reusable paper notes products were in fact invented by "3M" and Arthur "Fry" in 1974, when in fact they knew or should have known that Plaintiff "Amron" invented it in 1973 and put it into use in 1974 one year prior to 3M claims.  (see **Exhibits A-R** attached and citing U.S. Federal case CV-97-7281 AMRON vs 3M in the Eastern District of New York)

57.   The representations made by Defendants "3M' and "Fry" were false, are false and the Defendants either knew those representations to be false, or made those representations with reckless disregard as to whether the representations were true or not for business and financial gains and to gain an unfair advantage over their competition in the market place.

26

58.     In reliance upon said 1974 first inventorship continued to this day representations by the Defendants, Plaintiff "Amron" has been and continues to be severely damaged, thereby sustaining the severe injuries described above.

59.     Defendant's actions were and are still to day willful, wanton and/or reckless.

60.     By reason of the foregoing, Plaintiff Alan "Amron" has been damaged and is entitled to recover as against Defendants "3m" and "Fry" jointly and severally in an amount to be proven at trial, but not less than $200 million dollars.

61.     By reason of the foregoing, Plaintiff "Amron" is also entitled to an award of punitive damages from the Defendants in an amount to be determined at trial, but not less than $200 million dollars.

## IN SUMMARY

This is not the first time the Defendants 3M and Arthur Fry have stolen inventions at trade shows and failed to report that information to the patent office while obtaining patents. **(see Exhibit R attached here)**

PLAINTIFF AMRON IS CONTINUALLY BEING DAMAGED BY DEFENDANTS 3M AND ARTHUR FRY EVERYDAY WHILE THEY CONTINUE TO FALSELY PUBLICALLY CLAIM THAT THEY INVENTED THE POST-IT NOTE TRADEMARKED STICKY NOTE PRODUCTS INVENTION

In 1973 first to put into use, sold and or offered in commerce, was ruled by the USPTO to be the inventor. The facts and evidence put forward in the Amron vs 3M trade secret Federal case clearly shows that it was in fact Amron who is the inventor of the sticky note, not someone at 3M years later. Since Amron's invention was considered "prior art", it precluded any one else in the world including 3M from being awarded a patent on it. Inventorship - put in to actual use,

offered for sale in commerce, and its disclosure to 3M executives and the world in 1974 is proof
that Amron was and is in fact the sticky notes inventor.

Plaintiffs' Continuing Tort claims and Defamation, Unclean Hands, Fraudulent
Misrepresentations and Negligence causes of actions against Defendants' 3M and Arthur Fry
comes from 3M continually, intentionally, maliciously, fraudulently misleading the Plaintiff,
both in 1997 in letters from counsel and in conversations with counsels to get Plaintiff to settle
with them then, and again in 2011 letters to Plaintiffs' counsel and conversations with Plaintiffs'
counsel enticing them both times first in 1997 and again in 2011 to mislead them to believe that
Plaintiff didn't invent the note and adhesive pad in 1973, that Walter did in Switzerland in 1968.
They even sent Plaintiff with those official letters in 1997 and again in 2011 English translations
of that Swiss 1968 patent to fraudulently and unfairly get Plaintiff to go away both times
believing Plaintiff nor they 3M invented it at all.

Yet they 3M publicly, and allowed Arthur Fry publicly claimed they and Fry invented the note
and adhesive pad in 1974.

**Was the Defendants' lying to the Plaintiff and the PTO and Court then, or are they lying to
the PTO and this Court and the Plaintiff now.**

Either way Plaintiffs' claims and causes of action to null and void that ill gotten 1998 settlement
agreement in the first place. And enough "bad acting" "unclean hands" and "continuing tort"
"Defamation" to allow for the Courts to now grant the Plaintiff all Defendants'
revenues stemming from the Post-it notes products for the last 40 years. Probably close to $40
billion dollars plus Interest.

3M obtained numerous patents, so most of AMRON claims centered on allegations of fraud on
the patent office (which creates an antitrust situation when patents procured by fraud are

28

enforced or threats to enforce them are made, as AMRON alleged). There are some references to

a false claim made in a 3M trademark application, which is the sole Lanham claim

AMRON made (i.e., that 3M lied to the Patent and Trademark Office about when they created

and started using the product). AMRON also sought to invalidate 3M patents and to recover

royalties under them, which gave rise to the references to 35 USC 102. AMRON referred to their

conduct in "fraudulently obtaining patents" as unfair competition.

In 1997 Federal Case, AMRON had yet to make a claim of unfair competition based on false

advertising, another form of unfair competition. This would have been supported by the facts

AMRON alleged. In reading the release contained in section 4, it is interesting they choose the

words "causes of action....related in any way to the subject matter of the Action". Not sure what

"subject matter means" - it is not the same thing as **"facts alleged".**

In Minnesota and Florida law, Plaintiff AMRON has (4) options to void out his ill gotten 1998

3M confidential settlement agreement and understandings that lead to that agreement.

a. **Inadequate Consideration** -

In some cases, a settlement agreement can be voided if there is inadequate consideration. In

some settlement agreements, the terms of the settlement are so unfair, that a strong argument can

be made that there is no adequate consideration and the agreement must be voided. If everything

AMRON alleged were true, AMRON has a decent argument there.

b. **The Settlement Agreement is Unconscionable** -

A settlement agreement is not enforceable if it is unconscionable. The term unconscionable is a

rather nebulous term and it is hard to define exactly is unconscionable. An unconscionable

settlement agreement is one that makes no sense and which no fair and honest person would

accept. Where the party is an individual, such as AMRON, and not aided by counsel, there

29

is something to that argument.

c. **Unclean Hands** -

Enforcement of the agreement will amount to an equitable remedy (and as AMRON well knows by now, "one must do equity to receive equity." If AMRON could show that 3M procured the agreement by fraud, that would be a good start. Or that 3M made misrepresentations to induce AMRON to sign the agreement (such as that 3M would cease claiming to have invented the product first, which AMRON claims 3M did and in fact did stop making such claims for a short while after the settlement).

d. **Antitrust - Unfair Competition** - Legal review on the 1997 Amron vs 3M complaint itself shows;  (see **Exhibit R** attached here)

(1) 3M obtained numerous patents, so most of AMRON claims centered on allegations of fraud on the patent office (which creates an antitrust situation when patents procured by fraud are enforced or threats to enforce them are made, as AMRON alleged). There are some references to a false claim made in a 3M trademark application, which is the sole Lanham claim you made (i.e., that 3M lied to the Patent and Trademark Office about when they created and started using the product). AMRON also sought to invalidate their patents and to recover royalties under them, which gave rise to the references to 35 USC 102. AMRON referred to 3M conduct in "fraudulently obtaining patents" as unfair competition.

(2) In the 1997 Federal case, AMRON never made a claim of unfair competition based on false advertising, another form of unfair competition. This would have been supported by the facts AMRON alleged. In reading the release contained in section 4, it is interesting 3M choose the words "causes of action....related in any way to the subject matter of the Action". Not sure what "subject matter means" - it is not the same thing as **"facts alleged".**

30

3M sued by inventor in Post-it notes claims of inventorship, and breach of a 1997 settlement agreement and the parties understandings of that agreement.

Post-it notes - sticky notes Amron vs 3M and Arthur Fry - Federal case filed in NEW litigation on January 25, 2016, in the U.S. Federal District Court in the Southern District of Florida.

In 1973, an inventor created the simple sticky notes now so common in every office and household on the planet, and called it Press-on memo. That inventor was Alan Amron.

In 1974, the inventor purchased a booth at an invention trade show in New York City and offered his sticky notes invention in commerce. At his booth, he was asked by two 3M stationery industry executives for samples of his sticky notes that he called Press-on memo. They gave him their business cards, and said they would call him after they evaluate his Press-on memo sticky notes product.

In 1973, Amron introduced publically trademarked as Press-on memo sticky notes invention
In 1974, Amron gave samples of his sticky note invention to 3M Executives at a trade show
In 1974, Arthur Fry and 3M claimed to invent sticky notes and concealed it from the public
In 1977, 3M introduced sticky notes, trademarked as and calling it Press n' peel.
In 1980, 3M re introduced the sticky notes trademarked as and calling it Post-it notes.
In 1997, Amron heard for the first time that 3M was claiming to have invented the sticky notes they called Press n' peel then Post-it note.

On December 10, 1997 Amron sued 3M in the Eastern District of New York for falsely claiming to be the inventor of the sticky note, no matter what they called it.

In January of 1998, just weeks after the inventor sued 3M, the case was settled. It was understood and implied that 3M agreed not to continue saying they invented the sticky note, and to pay the inventor for his legal costs in the case.

In 2011, the inventor again heard publicly 3M claiming to have invented the sticky notes. It was tied to a 30th year anniversary of the sticky note invention promotion, and it continues to today.

In 2011, Amron attempted to contact 3M about the breached settlement from 1998, in which

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury of all issues triable to a jury.

DATED: This 2th day of March 2016

Alan Amron, Pro se Plaintiff
255 Evernia Street   #622
West Palm Beach, Florida 33401
(305) 343-7480 phone
(347) 402-0194 fax
alanamron@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that on this day March 2, 2016, I served the attached documents to the Defendants.  A True and Correct Copy of this "AMENDED COMPLAINT ", "PLAINTIFFS' AFFIDAVIT IN SUPPORT OF THIS AMENDED COMPLAINT" and "DEMAND FOR TRIAL BY JURY" was served upon Defendants by digital email service, as agreed:

**DEFENDANTS:**

MARK. A ROMANCE
Florida Bar No. 021520
E-mail: mromance@richmangreer.com
GEORGIA A. THOMPSON
Florida Bar No. 100181
E-mail: gthompson@richmangreer.com
RICHMAN GREER, P.A.
396 Alhambra Circle
North Tower, 14th Floor
Miami, FL 33134
Telephone: (305) 373-4000
Facsimile: (305) 373-4099
COUNSEL FOR 3M COMPANY AND
ARTHUR FRY

Alan Amron

34

# PLAINTIFF "AMRON" EXHIBITS LIST AND EXPLAINATIONS

## EXHIBITS A – R

**EXHIBIT A**

True and correct copy of the Wikipedia facts published of Defendants 3M and Art Fry Post-it note known history

**EXHIBIT A1**

True and correct copy of the Wikipedia facts published of Plaintiff Alan Amron known history

**EXHIBIT B**

True and correct copy of Press-On Memo and Post-It Note images

**EXHIBIT C**

True and correct copy of 1997 Amron vs 3M case for known facts and exhibits

**EXHIBIT C1**

True and correct copy of 1997 Amron vs 3M case exhibits

**EXHIBIT C2**

True and correct copy of 1997 Amron vs 3M case exhibits continued

**EXHIBIT D**

True and correct copy of Letter November 29, 1973 referencing communication about Amron memo project tacky and tackyless adhesive for his invention.

**EXHIBIT D1**

True and correct copy of Post mark Chicago Illinois envelope post office stamped dated 29 Nov 1973

**EXHIBIT E**

True and correct copy of Michael Solomon, Esq. attorney in 1974, affidavit notarized and signed

**EXHIBIT E1**

True and correct copy of Certificate of PRESS On Memo LTD NY State of corporation dated July 24, 1974

**EXHIBIT E2**

True and correct copy of Certificate of corporation for Press-on memo LTD

**EXHIBIT E3**

True and correct copy of Certificate of corporation for Press-on memo LTD continued

**EXHIBIT E4**

True and correct copy of Certificate of corporation for Press-on memo LTD continued signed by witness

**EXHIBIT E5**

True and correct copy of Mailing receipt for Press-On Memo LTD CT-4 1974 dated New York State Tax form mailed

**EXHIBIT E6**

True and correct copy of Open for business Post Office Box on July 22, 1974 stamped paid by the UNITED STATES POSTAL SERVICE

**EXHIBIT F**

True and correct copy of Original artwork of Insti-Sta concept for Press-On Memo sticky notes and pads in1973

**EXHIBIT F1**

True and correct copy of Original Press-On Memo sheet 1973 Used in 1974 mass mailing

**EXHIBIT F2**

True and correct copy of Original Press-On Memo art1973 Used in 1974 mass mailing

**EXHIBIT F3**

True and correct copy of Original Press-On Memo mass mailing envelope1973 Used for 1974 mass mailing

36

**EXHIBIT R**

True and correct copy of the news reporting the Defendants 3M had recently been found to have gone to a trade show and were given samples of an invention and then one year later filed a patent on it and didn't disclose any of that to the patent office.  Not the first time the Defendants have done this very same thing. Seems to be a pattern of deceit and unclean hands